# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | |
|---|---|
| JOSEPH P. GUILLORY<br>        LA. DOC #492565<br>VS. | CIVIL ACTION NO. 6:13-cv-0388<br><br>SECTION P<br><br>JUDGE RICHARD T. HAIK, SR. |
| WARDEN BURL CAIN | MAGISTRATE JUDGE PATRICK J. HANNA |

### REPORT AND RECOMMENDATION

*Pro se* petitioner Joseph P. Guillory, an inmate in the custody of Louisiana's Department

of Corrections, filed the instant petition for writ of *habeas corpus* pursuant to 28 U.S.C. §2254

on February 21, 2013. Petitioner attacks his 2005 second degree murder conviction and the life

sentence imposed by the Twenty-Seventh Judicial District Court, St. Landry Parish.  This matter

has been referred to the undersigned for review, report, and recommendation in accordance with

the provisions of 28 U.S.C. §636 and the standing orders of the Court. For the following reasons

it is recommended that the petition be **DISMISSED WITH PREJUDICE.**

### *Background*

Petitioner was convicted of second degree murder on January 21, 2005. The mandatory

life sentence was imposed on February 11, 2005. He appealed his conviction arguing a claim of

insufficiency of the evidence. [Doc. 10, pp. 2-10; Doc. 17-3, pp. 328-326; SCR pp. 3128-3136]

His conviction and sentence were affirmed in an unpublished opinion of the Third Circuit Court

of Appeals on February 1, 2006. *State of Louisiana v. Joseph P. Guillory*, 2005-00853 (La. App.

3 Cir. 2/1/2006), 924 So.2d 517 (Table). [Doc. 10, pp. 11-25; Doc. 16-3, pp. 328-343; SCR pp.

1528-1543]  On February 19, 2006 he filed an application for writs in the Louisiana Supreme

Court and thereafter a Supplemental Application; again, petitioner argued the single claim of insufficiency of the evidence.  [Doc. 10, pp. 26-36; 37-43] His application was denied without comment on November 22, 2006. *State of Louisiana v. Joseph Patrick Guillory*, 2006-1317 (La. 11/22/2006), 942 So.2d 554. [Doc. 10, p. 44; Doc. 16-3, p. 127; SCR p. 1327]

Petitioner filed a pro se application for post-conviction relief in the district court on January 26, 2007.  [Doc. 10, pp. 45-62; Doc. 16-3, p. 134-144; SCR pp. 1334-1344]   In that application he raised the following claims for relief: (1) ineffective assistance of counsel for failing to hire an independent DNA expert; for failing to file a motion to suppress petitioner's inculpatory statements; for failing to seek a "gag order" prohibiting statements to the press that could influence the outcome of the trial; and for failing to file motions to create a solid defense; (2) statements made to the police were made in violation of *Miranda* and *Edwards* and should have been ruled inadmissible; (3) prosecutorial misconduct when prosecutor asked the defendant why he had not related the whole story to the police; and, (4) prosecutor did not disclose statements of all the witnesses in violation of the open file discovery. [Doc. 10, pp. 45-62; Doc. 16-3, pp. 134-144; SCR pp. 1334-1344] In due course, counsel was appointed to represent petitioner and a hearing was held on January 13, 2011. [Doc. 10, pp. 63-132; Doc. 17-1, pp. 127-206;  SCR pp. 2127-2206] At that hearing, counsel for the petitioner called a single witness, Mr. Edward James Lopez, petitioner's court-appointed trial attorney.  At the hearing, Lopez was examined about the various allegations concerning ineffectiveness of counsel. At the conclusion of the hearing petitioner's post-conviction counsel argued, "... our position is just simply that what the Court – what the Court can look at is whether or not, in this particular case, the pre-trial motions could have been or should have been, rather, filed; whether or not evidence should have

2

been tested; whether or not the reliability of – of the evidence and of the testimony should have been tested by pre-trial motions, such as a motion to suppress." [Doc. 10, p. 115; Doc. 17-1, p. 290; SCR p. 2290]

Thereafter, the Court denied relief and dictated his reasons into the record –

The Court has heard all of the evidence presented in this motion, that evidence being the testimony of Mr. Lopez, and as indicated, the Court has reviewed this matter and is familiar with the record.

As to the evidence presented this date by Mr. Lopez, much of that evidence is, in fact, speculation as to what could have been, what may have been, but the evidence doesn't have any evidence that could have been presented at trial, in this Court's opinion, that should have been presented at trial.

Mr. Lopez is an experienced, seasoned defense attorney having practiced defense – criminal defense since approximately 1975, or maybe even earlier ...  Mr. Lopez, in his testimony, has indicated that if, in fact, there was any question as to *Brady* material, he would have certainly brought up a *Brady* motion; however, that he's been always presented with *Brady* material through open file discovery; that if there would have been any expert that could have discredited Mr. St. Andre, the neighbor who witnessed the vehicle on the track, that he certainly would have; and it's speculation that a private investigator continuously asking this witness – or there may have been some different testimony each time; there's apparently no controversy about the location of Mr. Guillory at the time of the  – shooting; and due to the non-presentation of evidence that would have been presented at the trial that was not presented at the trial, then this Court does not find that, obviously, that that would have changed the decision of the jury in this matter. Accordingly, this Court denies defendant's motion. [Doc. 10, pp. 130-131; Doc. 17-1, pp. 2305-2306; SCR pp. 2305-2306]

On March 29, 2011 petitioner filed a *pro se* writ application in the Third Circuit Court of Appeals. On May 3, 2011 the Third Circuit declined consideration of the writ application because the pleading did not comply with Court rules. *State of Louisiana v. Joseph Patrick Guillory*, No. KH 11 - 00384. [Doc. 10, p. 134] On July 21, 2011 petitioner re-filed his writ application in the Third Circuit. This new application was assigned Docket No. KH 11-00901.

3

Petitioner argued claims of (1) ineffective assistance of trial counsel; (2) manipulative and coerced statements obtained in violation of *Edwards v. Arizona*; (3) malicious and vindictive prosecution (prosecutor used petitioner's silence to impeach his trial testimony and prosecutor used perjured testimony to obtain the conviction); and, (4) prosecutor failed to disclose witness statements in discovery. [Doc. 10, pp. 138-157; SCR pp. 1799-1816] On June 25, 2012 the Third Circuit denied writs noting, "There is no error in the trial court's denial of Relator's application for post-conviction relief. Relator failed to carry his burden of proving entitlement to the relief sought. La. Code Crim.P. art. 930.2." *State of Louisiana v. Joseph Patrick Guillory*, No. KH 11-00901. [Doc. 10, p. 168; SCR p. 1701 and p. 3156]

On July 9, 2012 petitioner applied for writs in the Louisiana Supreme Court.  Again, he argued (1) ineffective assistance of counsel; (2) manipulative and coerced statement; (3) malicious and vindictive prosecution; and (4) failure of the prosecutor to disclose witness statements. [Doc. 10, pp. 158-167] On November 21, 2012 his writ application was denied without comment.  *State of Louisiana ex rel. Joseph Patrick Guillory v. State of Louisiana*, 2012-1627 (La. 11/21/2012), 102 So.3d 55.

He filed the instant petition on February 21, 2013; he argues the following claims for relief – (1) ineffective assistance of counsel; (2) malicious and vindictive prosecution; (3) denial of the right to confront and cross examine witnesses; and, (4) insufficiency of the evidence.

### *Law and Analysis*

### *1. The Standard of Review.*

The AEDPA standard of review provides different standards for questions of fact, questions of law, and mixed questions of fact and law. A state court's factual findings are

4

presumed correct, and a reviewing court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). The statute codifies both the presumption of correctness that attaches to state court findings of fact and the clear and convincing evidence burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact must be given deference unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir.2000), *cert. denied*, 532 U.S. 1039 (2001).

A state court's decision is contrary to clearly established federal law if: (1) the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir.2010); *Hill v. Johnson*, 210 F.3d at 485.

A state court decision unreasonably applies federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Penry v. Johnson*, 532 U.S. at 792; *Woodfox v. Cain*, 609 F.3d at 789.

An unreasonable application of federal law is different from an incorrect application of federal law. The court need not determine whether the state court's reasoning is sound; rather "the only question for a federal *habeas court* is whether the state court's determination is

5

objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price v. Vincent*, 538 U.S. 634, 641 (2003).

In this case, petitioner seeks relief from the judgments rendered by Louisiana's Third Circuit Court of Appeals and Supreme Court on direct review, and, the District Court, the Court of Appeals, and the Supreme Court on collateral review. Under the various scenarios described above, those rulings are entitled to deference and, as will be shown in the following discussion, should not be disturbed.

### 2. Claim Number One – Whether Guillory was denied Due Process and his right to Effective Assistance of Counsel Due to Prejudicial Errors Made by Trial Counsel.

In his first claim for relief petitioner argues that his trial attorney was ineffective in the following respects: (a) he failed to secure the services of a DNA expert; (b) he neglected to file a motion to suppress the State's DNA evidence which established the presence of the victim's blood on petitioner's shoe on the grounds that there was a break in the chain of custody; (c) he failed to suppress inculpatory statements made by the petitioner; (d) he failed to contact witnesses who could have testified that petitioner never owned a gun; and, (e) he failed to obtain a "gag order" prohibiting the prosecutor from making statements to the press concerning various aspects of the trial. [Doc. 1, pp. 6-8]

Petitioner argued these or similar claims in his original application for post-conviction relief filed in the District Court. [Doc. 16-3, p. 134-144; SCR pp. 1334-1344]

### (a) DNA or Forensics Expert and (b) Chain of Custody

At the evidentiary hearing convened on January 13, 2011, Mr. Kennison, the attorney

appointed to represent the petitioner in his post-conviction proceedings, argued that trial counsel was ineffective for failing to retain the services of expert witnesses – experts in the analysis of DNA evidence, experts in footprint analysis, and, even experts who would have testified to the number of yellow Chevy Caprices that were in existence at the time of the homicide – in other words, experts "to counter each piece of tangible evidence that –  or expert evidence that the State is going to put on ..." [Doc. 17-1, p. 191; SCR p. 2191]

At the evidentiary hearing Mr. Lopez, petitioner's trial counsel was asked if he hired "... a forensic expert to retest the alleged single blood drop ... in the inside of the [petitioner's] shoe..." Lopez responded, "In the hiring of experts ... if in my conversations with a client I ... determine that the evidence that was found is consistent with his statement, and there would be no reason to believe otherwise, then I would generally not need an expert." [Doc. 17-1, p. 145; SCR p. 2145 (emphasis supplied)] Thereafter he testified, "The reason why I wouldn't have done it (hired a DNA expert) because the spot on the shoe was ... totally consistent with what my client told me occurred that day." [Doc. 17-1, p. 146; SCR, p. 2146 (emphasis supplied)]  He also testified, with regard to questions concerning his failure to hire a forensic expert, that there simply was no DNA, fingerprints, or gunpowder residue linking petitioner with the murder weapon. When asked, "Did you – did you think it would be important to bring an expert to show the likelihood that a person could handle the gun and not have left their DNA on it?" He replied, "Well, that's surely what – what I wouldn't want proved."  [Doc. 17-1, pp. 152-153; SCR, pp. 2152-2153]

At the trial of this matter petitioner, through counsel, presented a consistent and coherent defense. He claimed from the outset – (a) that he and his kinsman, Justin Singleton, entered Lejeune's Grocery Store in the late afternoon of March 4, 2003, for the purposes of making a

purchase; (b)that while in the store, Singleton suddenly, and without warning, retrieved a Colt .380 pistol from his waist band  and shot Mr. Lejeune; (c) that petitioner was taken aback by this action and jumped over the counter to determine the extent of Mr. Lejeune's injuries; (d) that Singleton then fired a second shot into Mr. Lejeune; (e) that petitioner then fled the store to his car; (f) that shortly thereafter Singleton exited the store and both left the scene together; (g) that petitioner was totally surprised by the actions of Singleton and remonstrated with him as they drove together toward Church Point; (h) that at some point they changed positions and Singleton began to drive; (i) that upon their arrival in Church Point Singleton stopped at a Chevron station to refuel; (j) that Singleton retrieved a wad of currency from his pocket, presented this money to petitioner and directed him to pay for their fuel purchase; and, (k) that shortly thereafter the pair was arrested by officers of the Church Point Police Department.  [Doc. 16-1, pp. 340-400; 16-2, pp. 1-35; SCR, pp. 740-835]

As noted by counsel at the evidentiary hearing, the forensic evidence at the trial was totally consistent with petitioner's defense and therefore there was no need to hire an expert in forensics or to otherwise attempt to discredit the forensic evidence adduced by the State. [Doc. 17-1, pp. 145-146; SCR pp. 2145-2146]  The Louisiana courts ultimately concluded that petitioner was unable to demonstrate either deficient performance or prejudice so as to entitle him to post-conviction relief pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984) with respect to these claims.  That finding and conclusion is entitled to deference and since petitioner failed to show that the ruling was unreasonable, his claim must be dismissed.

Further, complaints of ineffective assistance of counsel based upon counsel's failure to call witnesses are not favored in *habeas corpus* review because the presentation of evidence is  a

8

matter of trial strategy and because allegations of what a witness might have said or would have stated are speculative at best. *Day v. Quarterman*, 566 F.3d 527 (5th Cir.2009) (citing *Bray v. Quarterman*, 265 F.App'x 296, 298 (5th Cir.2008)). To prevail on such claims, the *habeas* petitioner must identify the witness, establish that he or she was available to testify and would have done so, and set out the content of the witness's proposed favorable testimony. *Id.* (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir.1985)). A petitioner must present evidence on these points as part of the burden of proving trial counsel could have found and presented a favorable expert witness. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir.2010). Petitioner was afforded a full evidentiary hearing on his application for post-conviction relief; post-conviction counsel argued that trial counsel was ineffective for failing to retain and call expert witnesses to refute every item of the State's case, however, he failed to identify who these experts were and to what they would have testified. In the end, trial counsel's testimony indicated that his decision on this issue was a matter of trial strategy and thus not deficient performance.

### (b) Failed to Suppress Inculpatory Statement

Petitioner also claimed that counsel was ineffective for failing to suppress an inculpatory statement, namely, petitioner's admission that he kept the Colt .380 pistol in his car for protection.  He raised this claim in his application for post-conviction relief. At the hearing on the application for post-conviction relief, Mr. Lopez, petitioner's trial counsel, was asked whether petitioner claimed that Detective Speyrer continued to interrogate him after he invoked his privilege against self-incrimination and his right to counsel. Lopez replied,

> I think if – if he would have told me that, that he was  – after – after the assertion of a right to counsel, that he  – that the police continued to interrogate and  – and he had given statements that were inculpatory thereafter, I would have surely – I

9

would have surely sought to suppress those statements... If – if I learned that whatever statements given to Detective Speyrer were made in contravention of a request for counsel, I  – I believe that I would have, indeed filed a motion to suppress ... I honestly don't recall – I don't recall when the statement was made in terms of  – in terms of the interrogation and the assertion of the right. I  – I just independently don't recall right now. [Doc. 17-1, pp. 257-258; SCR, pp. 2257-2258]

There was no evidence adduced, either at trial or at the evidentiary hearing, to establish that petitioner's inculpatory statement was made <u>after</u> he invoked his right to counsel.

Indeed, the evidence established that the inculpatory statement was made before petitioner invoked his right to counsel. During the trial, Officer Lafosse, one of the arresting officers, testified that when he approached the vehicle in question he noticed "... a small caliber handgun in an armrest on the front seat." [Doc. 16-1, p. 319; SCR p. 719] That weapon was ultimately secured and forensic tests established that it was indeed the murder weapon. [Doc. 16-1, pp. 157-161; SCR, pp. 557-561]

In his trial testimony, petitioner denied having made the statement to either Detective Speyrer or Detective Willis that he kept the .380 Colt in his car for protection. [Doc. 16-2, p. 23; SCR, p. 823] Detective Rene Speyrer of the St. Landry Parish Sheriff's Office then testified as a rebuttal witness.  He testified that he advised petitioner of his *Miranda* rights in conjunction with his efforts to conduct an atomic absorption test on petitioner's hands. The advice of rights form was introduced into evidence. [See Doc. 16-3, p. 130; SCR p. 1330] During the course of their conversation petitioner advised Speyrer that he had not fired a firearm that day, but had shot turtles on the preceding day and that the .380 pistol that was recovered at the time of his arrest was kept in his vehicle for protection. Further, Speyrer testified that no threats, offers, promises or inducements had been offered to petitioner prior to the time he made these statements.  [Doc.

10

16-2, pp. 37-46; SCR, pp. 837-846]

The inculpatory statement attributed to petitioner was made prior to the time he invoked his right to counsel; he presented no evidence to the contrary and instead claimed that he did not in fact make the statement. Indeed, at the post-conviction hearing, counsel testified, "I know my client asserted the right to counsel ... And I don't believe that there was any – that there was any further interrogation after the assertion." [Doc. 17-1, p. 257; SCR, p.2257] Clearly, there were no grounds which would have supported a motion to suppress. An attorney is not ineffective when he fails to raise a meritless claim or file a meritless motion.  *Sones v. Hargett*, 61 F.3d 410, 415 n. 5 (5th Cir.1995); *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir.1995); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir.1990).  The State court's rejection of this claim has not been shown to be unreasonable and therefore this claim must be rejected.

### (c) counsel failed to contact witnesses who would have testified that petitioner did not own a gun.

Petitioner's post-conviction counsel did not adduce any evidence on the claim that counsel failed to contact witnesses concerning his gun ownership. Further, petitioner did not supply such a list with his application for post-conviction relief. As previously noted, such complaints of ineffective assistance of counsel based upon counsel's failure to call witnesses are not favored in *habeas corpus* review because the presentation of evidence is generally a matter of trial strategy and because allegations of what a witness might have said or would have stated are speculative at best. *Day v. Quarterman*, 566 F.3d 527 (5th Cir.2009) (citing *Bray v. Quarterman*, 265 F.App'x 296, 298 (5th Cir.2008)). To prevail on such a claim, the *habeas* petitioner must identify the witness, establish that he or she was available to testify and would have done so, and

11

set out the content of the witness's proposed favorable testimony. *Id.* (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir.1985)). A petitioner must present evidence on these points as part of the burden of proving trial counsel could have found and presented a favorable witness, including an expert witness. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir.2010). Having failed to do so, petitioner is not eligible for *habeas corpus* relief with respect to this claim.

### (d) counsel failed to move for a "gag order."

As to the claim that counsel was ineffective for not obtaining a "gag order," that claim was briefly addressed in the post-conviction evidentiary hearing.  At that hearing, petitioner's post-conviction counsel posed the following question to trial counsel, "Is it correct that the District Attorney or the State made statements that were reported in the Daily World prior to trial concerning the defendant involvement in the – in the murder?" Counsel testified that he did not recall and advised further that it was his custom to clip such articles out of the paper and send a copy to his client. Further, when asked about whether he considered moving for a change of venue or for otherwise dealing with the issue during *voir dire*, Counsel replied,

> Well, the question is – the question is – is always in *voir dire* is, is whether or not you've heard anything about the case, we would normally question them about their knowledge or lack of knowledge – or their knowledge of certain facts. We have found that an incredible amount of people, including myself, don't read the Daily World. So whatever appears in the Daily World is – you know, we can get a whole panel and not find a single person that even gets the Daily World. So if there – if there were terrible things said by Mr. Richard (prosecutor) and Ms. Gothreaux (prosecutor) in the paper about my client, and that people on the jury had read that, I – I surely believe that I would have known because I would have asked them. [Doc. 17-1, pp. 261- 262; SCR, pp. 2261- 2262]

Petitioner has provided no evidence to establish that counsel's failure to move for a pre-trial "gag order" amounted to either deficient performance or resulted in prejudice. As noted by

12

counsel, the issue is whether or not the jurors who judged this case were prejudiced by a news

paper article that appeared sometime prior to trial.[1] He has not shown that any of the potential

jurors or any of the jurors who sat in judgment were so prejudiced. His claim is without merit.

***2. Petitioner's rights were violated when he was questioned after invoking his right to counsel
and therefore inculpatory statements should have been ruled inadmissible.***

In his original petition filed herein on February 21, 2013, petitioner listed 5 separate

claims for relief. [Doc. 1, p. 2 (Table of Contents)] However, petitioner omitted page 9 from his

original petition. It appears from the language on page 10, however, that petitioner argues that his

statement to Detective Speyer was inadmissible because it was obtained after petitioner invoked

his right to counsel. [Doc. 1, p. 9] On March 14, 2013 petitioner filed his petition on the form

provided to *habeas* petitioners in this District and framed Claim Two as follows, "I signed my

waiver of rights form 3 times and ask[ed] for an attorney present after signing them. Detective

Rene Spreyrer gave a false report that I stated I owned the murder weapon. Detective Robert

Willis confirmed that after signing my waiver of rights form I asserted my right to counsel."

[Doc. 5] The Respondent's Answer in Opposition makes no mention of Claim Two [Doc. 14];

nor does petitioner's Traverse [Doc. 18].

In any event, petitioner herein makes claims of fact that are simply unsupported by the

record. Petitioner basically argues two claims: (1) that his statement concerning the ownership of

the murder weapon was never made; and (2) that if made, the statement was inadmissible since it

---

[1] The offending article appeared in the December 15, 2004 issue of the Daily World and
recounted the events of the first day of Justin Singleton's trial which preceded petitioner's trial.
The article quoted Assistant District Attorney Richard's as saying, "[t]his was a cold-blooded
murder." [Doc. 16-3, p. 131]

was obtained in violation of his right to counsel.

The issue was raised during the evidentiary hearing. Trial counsel testified that had it come to his attention that petitioner was interrogated after invoking his right to counsel, that he would surely have filed a motion to suppress any inculpatory statements. [Doc. 17-1, pp. 154-156, SCR pp. 2154-2156]

The trial transcript confirms that the State's witness testified that the alleged inculpatory statement was made at a point in time prior to petitioner's assertion of his right to counsel. Petitioner testified at trial. On cross-examination he identified the advice of rights form that was read to him by Detective Speyrer and signed by petitioner and the form was admitted without objection as State Exhibit 48. [See Doc. 16-3, p. 130] Petitioner then admitted that after his rights were read he spoke to Detective Speyrer briefly before invoking his rights. However, petitioner further stated, "We did not conversate – I did not want to say any statements to Mr. Rene Speyrer. I did not want to say any statements to him." He then went on to deny ever speaking to the Detective and specifically denied having told him that he shot the murder weapon on the day prior to the crime and further denied telling him that he "kept the .380 Colt in [his] car for protection." [Doc. 16-2, pp. 18-23; SCR 818-823] Thereafter, petitioner admitted to telling Detective Willis that the murder weapon belonged to Singleton's great uncle, that he had shot the pistol on the day before the robbery and homicide, but that otherwise he invoked his right to counsel. [Doc. 16-2, pp. 24-29; SCR 824-829]

On re-direct petitioner again admitted having told the officer that the pistol in question belonged to Singleton's great uncle, or rather "... Jean Anderson's great uncle..." [Doc. 16-2, pp. 30-35; SCR, p. 830-835]

Thereafter, Detective Speyrer was called as a rebuttal witness by the State.  He confirmed in his testimony that he read petitioner his rights; that petitioner indicated he understood his rights by signing the waiver of rights form; and, that no force, violence, threats or promises were made by Speyrer or anyone else. He testified that his purpose in being in proximity to the petitioner was to conduct an atomic absorption test to determine whether petitioner had recently fired a hand gun. According to the Detective he asked petitioner if he had fired a hand gun that day and petitioner advised that he did not fire a hand gun on that day but had done so the day before. According to Speyrer petitioner also admitted having gone to Mr Lejeune's store on the morning of March 4 and he further admitted to keeping the .380 pistol in his car for protection. Finally, according to Speyrer petitioner advised that in the end he would be cleared of any charges.  [Doc. 16-2, pp. 37- 46; SCR p. 837-846]

Detective Willis then testified that petitioner was advised of his rights, that no force or threats or inducements were made and that petitioner stated that he visited Mr. Lejeune's store on the morning of March 4, that he shot the pistol the day before, and that the pistol seized at the time of his arrest belonged to his co-defendant's great grandfather.  He also testified that petitioner denied any knowledge of what occurred at the store on the afternoon of March 4, and that after that he invoked his right to counsel.  He also testified that Speyrer and petitioner may have engaged in informal conversation, but that Speyrer did not interrogate the petitioner. [Doc. 16-2, pp. 48-57;SCR pp. 848-857]

As noted above, petitioner asserts two alternative claims – first, that he did not make the statement attributed to him by Detective Speyrer and second, that the statement, if made, was inadmissible since it was made after petitioner invoked his right to counsel.  Both claims concern

15

issues of fact.  The trial court instructed the jury as follows,

> If the State offers evidence of a statement by the defendant you must first determine whether the statement was in fact made. You must then consider whether the statement if made was accurately recorded or repeated.
>
> If you find that the defendant made the statement, you must also determine the weight or value that the statement should be accorded, if any. In determining the weight or value to be accorded a statement made by a defendant, you should consider all the circumstances under which the statement was made. In making that determination, you should consider whether the statement was made freely and voluntarily without influence of fear, duress, threats, intimidation, inducement or promises. [Doc. 16-2, p. 151, SCR p. 951]

Here, it is impossible to determine whether the jury concluded that the inculpatory statement was made, or if so, whether it was made under duress after petitioner invoked his right to counsel. However, if it is assumed that the jury believed the testimony of Det. Speyrer that petitioner admitted to owning the murder weapon and, that the statement was made prior to petitioner's invocation of his right to counsel, such  findings were clearly the province of the jury and petitioner has failed to demonstrate error.  The weight of the evidence indicates that the statement was made and, that it was made at a point in time before petitioner asserted his right to counsel. In short, petitioner's claim is manifestly without merit.

### 3. Malicious and Vindictive Prosecution when the prosecutor used petitioner's invocation of his rights under the Fifth Amendment against him during cross examination

As previously noted, petitioner testified at the trial. His testimony [see Doc. 16-1, pp. 340-400; 16-2, pp. 1-35; SCR, pp. 740-835] may be summarized as follows:

Petitioner is a distant relative of Justin Singleton with whom he shared a house in St. Landry Parish in the months leading up to March 4, 2003.  He owned a Chevrolet Caprice

Classic painted either yellow, tan or beige and that on the morning of March 4, 2003 he loaned this car to Singleton who then left their residence and returned approximately 90 minutes later. Upon his return, petitioner accompanied Singleton to his mother's house; and then later the pair drove toward Opelousas on Hwy. 190. At some point, near Lawtell, they ran out of gas and walked to the Lawtell Fast Food market where they filled up a 5 gallon gasoline container and began walking back to petitioner's automobile. As they were walking back toward the car, their relative Mary Agnes Guillory Dominick stopped and offered them a ride; after she dropped the pair off near their car she left only to return moments later to remind them to prime the carburetor. The pair then got the vehicle started and went to the house of one of Singleton's friends in Opelousas where they stayed for 45 minutes to an hour. The pair left and made plans to meet up with these friends in Lafayette later on that day.  They returned to their home briefly and then drove back towards Opelousas on Hwy. 190.

Singleton told plaintiff to stop at Lejeune's Grocery Store and both exited the car and entered the store.  At this time there were no other customers in the store or parking lot.  Upon entering the store Singleton asked the proprietor, Mr. Lejeune for a cigar. When Lejeune turned his back to retrieve the merchandise, Singleton pulled a pistol from his shirt and shot Mr. Lejeune in the head. Petitioner "freaked out." He climbed over the counter to check Mr. Lejeune's vital signs. He could detect no pulse and remonstrated with Singleton.  Singleton then shot Mr. Lejeune a second time and with this second shot petitioner jumped back over the counter and ran outside.  Petitioner did not touch or take any money from the victim or the tray. He claimed to have no prior knowledge of Singleton's plans to murder and rob Mr. Lejeune.

Upon exiting the store petitioner ran to his car but he was so "messed up" and "in shock"

that he could not decide what to do. He waited in the car for about 2-5 minutes before Singleton

exited the building and returned to the car. Mr. Pierrotti, a customer, arrived, exited his vehicle

and headed toward the store. Singleton got in the car and ordered petitioner to drive. Petitioner

complied. As they exited the parking lot Singleton called his girl friend on his cell phone to make

plans to meet up with her in Church Point. Petitioner objected and told Singleton that he did not

want to go to Church Point, that he wanted to go to Lafayette instead; he pulled over the car told

Singleton "This is your show..." and they exchanged places. Singleton then drove to Church

Point and pulled into a Chevron filling station.  Singleton then reached into his pocket, handed

petitioner a wad of cash and ordered him to get some gas. Petitioner then went into the store and

purchased $10 worth of gas.

   He and Singleton were arrested as he returned to the car and $65 more or less was seized

from petitioner by the arresting officers. Petitioner again denied any knowledge of Singleton's

plans to commit robbery and murder. He denied being with Singleton earlier in the day in the

vehicle parked on Moline Road near Lejeune's store and denied seeing the gun used as the

murder weapon until Singleton shot his victim.

   On cross-examination he was asked, "And you never saw Singleton go behind the

counter." He replied, "No I got out of the store..." [Doc. 16-2, p. 2; SCR, p. 802] Then the

following exchange took place:

   Q. You got out the store and you sat in your car.
   A. Yes, I did.
   Q. And you waited for Justin Singleton to come out?
   A. I didn't necessarily wait for Justin Singleton to come out.
   Q. Will, what were you waiting for?
   A. I was in a  – I was in a messed up state of mind, Mr. Richard. I  – I didn't know
   what to do Mr. Richard. I didn't know whether to leave him or to stay. I didn't

18

know what to do.

Q. Why would you stay? This person has just done something that you find absolutely, totally, and incredibly horrible. Something that is so vile that you were stunned, and you're going to leave – you're going to wait for him?

A. If I'd leave –

Q. 'Yes' or 'no.' You're going to wait for him?

A. I don't know.

Q. You don't know.

A. If – you don't know until you're put in those shoes, until you're walking it out. You don't know. What if I was to drive off and he was to shoot me down in the car and I was to die, you know.

Q. He was in the store. You could have driven away. He couldn't have shot you because –

A. He could have walked –

Q. – he was in the store.

A. – out of the store at any minute. A bullet travels faster than a car, Mr. Richard.

Q. So you were worried that he would come out and shoot at you.

A. I wasn't worried about that, that's just – that's an assumption, just like you're making an assumption to me. I don't – I didn't know what to do. I was in a – in a shocking state. I didn't know what to do.

Q. So you came – you go down the road and you stop the car and tell him, 'I'm not going to do anything more.'

A. Yes, sir. I stopped the car.

Q. And you changed – you get on the passenger side.

A. Yes, I do.

Q. Why didn't you get out of the car and say, 'Hey, man, you started something. I'm out of here.'

A. He has a pistol.

Q. Why don't you get out of the car and say, 'I'm out of here.'

A. I never said 'I'm out of here.' I never said that.

Q. No, why didn't you say that.

A. And just leave the car?

Q. Yes, sir.

A. I don't believe he's going to let me walk away from the car.

Q. Did he say anything to you?

A. No, but I'm not going to test him, he has a pistol on him and he just shot somebody.

Q. He had the pistol out?

A. Yes, the pistol was on his lap in the car when I was driving. When I pulled over, he grabbed the pistol off his lap and walked around to the other side of the car.

Q. Do you remember what you told him when you pulled over?

A. I must have told him, 'Man, I'm – ' I said, 'This is your show.'

19

Q. 'This is your show.'

A. 'This is your show.' Yes, I did. I'm not –

Q. And you said that, 'This is your show.'

A. Yes, I did.

Q. And you were frightened of him, so you got in on the passenger side.

A. Yes, and I sat there.

Q. And you sat there.

A. Yes, sir.

\*   \*   \*

Q. – you're telling this jury that when he put off – pulled out that wad of money, after having just shot a man and left him in the store, that you did not know, did not believe, did not think, did not suspect, did not worry, that that money was the money that was stolen from the Lejeune Grocery?

A. Suspicion could have ran through my mind.

Q. Suspicion.

A. Suspicion could have.

Q. So if somebody hands you a bunch of stolen money, you're going to put it in your pocket and go inside and buy some gasoline when [you] know the cops are right behind you?

A. I know the cops are about [to] end this. I – I wanted to get away and I wanted to tell, you know, but I can't. I can't do it right now because he's there and he has a  – has an automatic loaded pistol that I'm afraid of. I don't want my life taken away.

Q. So you want to tell, at that point you want to tell, is that correct?

A. That's correct.

Q. You want to tell the police, Listen, I'm in this car. I walk in this store. I don't know this man has a gun, and you want to tell the police right then and there in Church Point, right?

A. (No response.)

Q. 'Yes' or 'no.'

A. Well, first I want to get a lawyer and then I want to talk.

Q. No. No. Did you just tell this jury that when you're in the store you want to tell? Did you just tell them that?

A. I wanted to tell the people, but I can't do nothing until I get away from him, because he's – he's a threat. I can't –

Q. He's a threat.

A. Yes. Yes, Mr Richard.

Q. So do you tell anybody after – after you get away from Justin?

A. Well, --

Q. 'Yes' or 'no,' do you tell anybody?

A. No, I couldn't. I didn't have a chance to.

Q. You didn't have a chance to?

A. No, I didn't.

20

Q. You never had a chance to.
A. I didn't have the right chance to.
Q. The right chance. Oh, I see. So when Officer Rene Speyrer – do you know who I'm talking about?
A. (No response.)
Q. Oh, just wait –
A. Maybe. [Doc. 16-2, pp. 2-8; SCR, pp. 802-808]

At which point petitioner's attorney objected, and out of the presence of the jury made the

following observations,

It's ... impermissible for a District Attorney in ... examining a defendant to, basically, say, Why didn't you tell the police everything you know about this incident at the time of – why are you telling us now and you didn't tell the police at the time of the incident? At the time of the incident, the police give *Miranda* warnings. He says ... after I spoke to a lawyer, I'd be more than happy to talk, and the situation never came up, but bringing before a jury that – that someone asserted a constitutional right, especially the right to remain silent, is that it's impermissible to do before a jury... It's – it's just a question of – you get someone on the stand, Your honor, and you say, Well, here you are telling us this big story, you know. Well, why didn't you tell the police at the time of your arrest that this is what happened? Especially, when the police tell him, You don't have to say a thing. You don't have to say anything... And they can cross-examine him, but they cannot start this inference that – that what you're doing now, Why didn't you tell the police that at the time of your arrest? Why didn't – why didn't you tell – why didn't you tell them that at the time of your arrest? And you say, Well – well, duh, because I've got a constitutional right – I've got a constitutional right to remain silent and you just told me that. So the inference is – the inference is that because he urged that constitutional right, he's done something wrong... [Doc. 16-2, pp. 9-11; SCR, pp. 809-811]

After some argument, the prosecutor observed,

... the defendant himself has broached this subject because when I asked him why he went into the [store] with money, not talking – not talking at all about talking to the police, he said, quote, 'I wanted to tell.' He has put this issue at an exculpation of his actions and he cannot now then waive the flag and say, I wanted to tell, but you can't ask me why I didn't tell. He cannot say to this jury, I wanted to tell, but then I decided it wasn't the right time – that's the – he's put it in front of us. But on top of that, and I'm not going to go into it now, because I'm not going to tell the defendant where I'm going with my questioning, but the

21

defendant did tell something and he told it to Officer Speyrer ... So that is before he invoked a privilege..." [Doc. 16-2, pp. 13-14; SCR, pp. 813-814]

Whereupon the court noted, "I concur with your observations, Mr. Richard. The objection is overruled. The objection is noted for the record..." [Doc. 16-2, p. 14; SCR, p. 814]

Thereafter, Detective Speyrer was brought into court and petitioner acknowledged that it was Speyrer who read petitioner his *Miranda* rights. He then claimed that after having been read his rights, he refused to provide a statement to Detective Speyrer. He did, however, acknowledge that he told another detective, presumably Detective Willis, that he had shot at turtles from a bridge on March 3, that he had recently gotten his automobile and the license was in the rear glass and that he had been stopped on that account on some other occasion. He denied having told either detective that he had been to Lejeune's Grocery earlier on the morning of March 4. [Doc. 16-2, pp. 18-23; SCR, pp. 818-823]  When asked, "Did you advise Officer Speyrer that you had nothing to do with this murder and you would just have to wait and this would be cleared up?" He replied, "I told the other detective that." When asked, "Did you advise Officer Speyrer that you kept the .380 Colt in you car for protection?" He replied, "No, I did not. I didn't tell either one of them that." When asked, "Did you tell him (Detective Willis) that the gun belonged to Mr. Singleton's great – to Mr. Singleton's great grandfather?" He replied, "No, I did not. I said it was a great uncle." He then again acknowledged that he told Detective Willis that he had shot the weapon the day before at the Lucius Guillory Bridge." When asked, "Did you deny having any knowledge of the incident at Lejeune's Grocery? Did you tell him you knew nothing about what had happened at Lejeune's Grocery?" He replied, "I told him that it would all sort itself out through time." [Doc. 16-2, pp. 23-28; SCR, pp. 823-828]  The cross-examination of

22

petitioner concluded as follows:

> Q. So you wanted to tell the police when they were arresting you or when they were taking you into custody.
> A. I wanted to.
> Q. You wanted to.
> A. (Nods head in the affirmative.)
> Q. And you talked to Officer Willis about what happened the day before.
> A. He asked me. He asked me.
> Q. But you didn't talk about what happened on Mardi Gras Day?
> A. I wanted to talk with my lawyer present, you know, hey – excuse me.
> Q. Mr. Guillory, my questions are not asking you for explanation. You may give your explanation. I want a 'yes' or 'no' answer. You didn't tell Officer Willis anything. You told him about what happened the day before. You talked about going to the store at 11:00 to 11:15. You talked about shooting turtles, but you never told him anything about what happened on March 4.
> A. No, I –
> Q. Is that correct?
> A. No, I did not. [Doc. 16-2, pp. 28-29; SCR, pp. 828-829]

Following the conclusion of petitioner's testimony, the defense rested and the prosecution called Detectives Speyrer and Willis in rebuttal. Speyrer acknowledged that he read petitioner his *Miranda* rights prior to performing the atomic absorption test and that petitioner made certain statements to him prior to invoking his right to remain silent, namely, he denied having fired a gun on March 4, but admitted to having fired a gun on the previous day; he admitted to riding in a car with Justin Singleton on March 4, and, he acknowledged that he and Singleton lived together.  He further advised Speyrer that he had been to Lejeune's Grocery on the morning of March 4, 2003, but denied having returned to the store on that day.  Finally, according to Speyrer, petitioner advised him that he kept the Colt .380 pistol in his car for protection.  Speyrer testified, "He said that in the end, he would be cleared, that we would get to the bottom of this and he would be cleared." On cross-examination, Speyrer was asked, "I'm just curious, Officer, I'm

23

looking at your report, didn't he tell you that he had nothing to do with the murder and he would just have to wait and this would be cleared up?" To which Speyrer replied, "Yes, sir."

Willis also testified. He stated that prior to invoking his right to counsel, petitioner admitted to having gone to Lejeune's Grocery at approximately 11 – 11:30 a.m. on March 4.  He also testified that petitioner admitted to having fired the gun on March 3, and, that the weapon belonged to Singleton's great grandfather. Finally, he testified that petitioner said nothing about what had happened in the store later in the day on March 4. Willis denied having heard Speyrer's conversation with petitioner, but admitted that they could have had a casual conversation that he would have been unaware of. [Doc. 16-2, pp. 37-57; SCR pp. 837-857]

Petitioner claims now the prosecutor "used petitioner (sic) right to silence against him during cross examination." [Doc. 1, p. 10] As noted above, petitioner's defense was that he was unaware of Singleton's plans to murder and rob Mr. Lejeune and that he was shocked by the brutality of the crime. He further testified that he was afraid to attempt to leave the company of Singleton because he feared that he, too, would be shot, but he continued to insist that he wanted to tell the police or someone about what happened at Lejeune's Grocery, but he did not. Petitioner's continued pre-arrest silence (petitioner made no mention of his plight during the time he was purchasing gasoline at the Chevron station) and  post-arrest silence (petitioner again made no mention of his plight during the time immediately after his arrest) were a valid subject of inquiry by the police authorities given his testimony at trial. *Jenkins v. Anderson*, 447 U.S. 231 (1980) (pre-arrest silence); see also *Fletcher v. Weir*, 455 U.S. 603, 607 (1982) ("... we do not believe that it violates due process of law for a State to permit cross-examination as to post-arrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave

24

to the judge and jury under its own rules of evidence the resolution of the extent to which post-arrest silence may be deemed to impeach a criminal defendant's own testimony.)

That was essentially the ruling of the trial court. Petitioner has not shown this ruling to be unreasonable. In short, petitioner's claim is clearly without merit.

***4. Petitioner was denied the right to confront and cross-examine State's witness when prosecution failed to comply with the rules of discovery by failing to disclose the statement of Mary Agnes Dominick.***

In his original application for post-conviction relief, petitioner advanced this argument as follows, "... the District Attorney did not comply with Louisiana Criminal Code of Procedure Article 717 and 723 [in] violation of the defendants 2nd amendment right... District Attorney Donald Richard did not disclose statements from all of his witnesses that he planned to use in trial. Defendant received his open file discovery with a list of all potential witnesses that the prosecution intended to use during trial ... Mrs. Mary Agnes Dominigue (sic) was not included on the list. But she was used during trial. The prosecution with held (sic) her statement from the defense as an underminding (sic) tactic, and that makes it a violation of the 16th amendment of the constitution..." [Doc. 10, p. 52]

Mary Anges Dominick testified during the State's case-in-chief and in rebuttal.  During the case-in-chief she testified – that petitioner and Justin Singleton are her cousins; that petitioner is more like a nephew to her "because his father is my uncle, but we were raised like brothers and sisters;" that on the afternoon of March 4, 2003 she observed petitioner and Singleton walking on the side of Hwy. 190 going towards Eunice; she noticed that one of them was carrying a gas can so she gave the pair a ride to within a block of where their car had run out of gas; that after

dropping them off, she "made the block came around and pulled up behind their car" to remind them to prime the carburetor with gas before attempting to start it; she noted that the vehicle's license was in the back window and not on the rear of the vehicle; that she waited until the pair got the vehicle started and watched them head out toward Opelousas on Hwy. 190; and, that all this happened some time between 4:30 - 4:45 p.m. on March 4.  She concluded her testimony by stating that she had visited petitioner presumably while he was incarcerated awaiting trial.  [Doc. 16-1, pp. 260-272; SCR, pp. 660-672] Mrs. Domingue also testified as a rebuttal witness. She reiterated that it was between 4:30 - 4:45 p.m. on March 4 when she saw petitioner and Singleton. [Doc. 16-2, pp. 58-59; SCR, pp. 858-859]

As noted above, petitioner testified in his own behalf. Petitioner testified that he and Singleton ran out of gas while en route to Opelousas on Hwy. 190 in Lawtell; that they went to the Lawtell Fast Food and filled their 5 gallon container with gas; that when they were returning to the car with the full gas can, Mrs. Dominick stopped, picked them up, and drove them to within a block of their car; that shortly after dropping the pair off, Mrs. Dominick returned to remind them to prime the carburetor with gasoline; that she left and they then drove to Opelousas.  [Doc. 16-1, pp. 340-400; 16-2, pp. 1-35; SCR, pp. 740-835]

At the post conviction hearing, the following exchange occurred between petitioner's post-conviction counsel, Mr. Kennison, and petitioner's trial counsel, Mr. Lopez:

Q. Is it true that there was one witness that was brought in and allowed to testify that was not on the witness list?
A. (No response.)
Q. Specifically, one of the defendant's aunts.
*   *   *
A. All right. I'm sorry that I – I'm looking at the witness list – again, I'm looking at the witnesses that appeared and I – and the only one I can see is Mary Alice

Agnus (sic) Dominick.
Q. Yes.
A. I – and I don't recall Ms. Dominick at all. I see that she was a rebuttal witness
for the State.
Q. So it was rebuttal?
A. She was a rebuttal witness for the State. She was the last witness apparently
called at trial.
Q. Uh-huh (YES). And were you surprised by that witness being called at trial?
A. I – independently, sir, I don't have – I don't recall Ms. Dominick's testimony at
all. I mean, I don't recall Ms. Dominick at all. [Doc. 17-1, pp. 153-154; SCR, pp.
2154-2155]

Petitioner alleged that his right to confront a witness, Mrs. Dominick, was violated when

the State failed to list her as a witness on the list of witnesses made available in the "open file"

discovery process. Petitioner herein has not alleged a violation of Louisiana law, much less a

violation of the United States Constitution. La. C.Cr.P. art. 716(D) mandates disclosure of "any

written or recorded statements of any witness the state intends to call in its case in chief at the

trial." There is no indication that the State was in possession of any written or recorded statement

by this witness. Further, art. 716(F) provides, "Nothing in this Chapter shall obligate the state to

provide to any defendant a witness list for any trial or pretrial matter."

Finally, even if a written or recorded statement existed, petitioner shows no prejudice

resulting from the State's failure to provide a copy, or any notice of its intention to call this

witness in advance of trial. The witness's testimony at both the case in chief and on rebuttal was

totally consistent with petitioner's trial testimony. Further, Mrs. Dominick testified at Singleton's

trial which took place prior to petitioner's trial. She apparently testified to the same facts that she

recited at petitioner's trial.[2]  Petitioner's attorney was afforded the right to cross-

---

[2]  *See State of Louisiana v. Justin Singleton*, 2006-1372 (La. App. 3 Cir. 3/14/2007), 953
So.2d 168 at 171, " Mr. Anderson's mother, Mary Agnes Guillory Dominick, is also both

examine this witness and therefore petitioner shows no violation of the confrontation clause.

Having showed neither a violation of the Constitution nor prejudice resulting therefrom,

petitioner's claim is without merit.

### 5. Insufficiency of the Evidence

On direct appeal, petitioner, through counsel, argued a single assignment of error, "The

evidence was not sufficient to convict the defendant of the charge of Second Degree Murder."

[Doc. 10, p. 7]

The Court of Appeals, citing Louisiana jurisprudence which in turn cited *Jackson v.*

*Virginia*, 448 U.S. 307 (1979) articulated the appropriate standard for appellate review of

insufficiency of the evidence claims as follows, "When a defendant raises the issue of

insufficiency of the evidence on appeal, the critical inquiry of the reviewing court is whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable doubt.

[citations omitted] It is the role of the fact finder to weigh the respective credibility of the

witnesses, and therefor the appellate court should not second guess the credibility determination

of the tier of fact beyond the sufficiency evaluations under the *Jackson* standard of review.

---

Defendant's and Guillory's cousin, although she feels more like an aunt to them. On March 4, 2003, Mrs. Dominick drove away from Opelousas toward Eunice, going west on Highway 190. Between 4:30 p.m. and 5:00 p.m., Mrs. Dominick noticed Defendant and Guillory walking along the roadside with a gas can. Mrs. Dominick picked them up and drove them to Guillory's car, which was parked on the opposite side of the road and pointed east toward Opelousas. Once they started the car, Mrs. Dominick continued her trip to Eunice. Guillory's car was yellow and looked like the car pictured in the State's photographs. Mrs. Dominick did not remember whether the car had a license plate on the back of the vehicle, but she did recall that there was a permanent license plate 'kind of laying over' in the rear window of the car. After visiting with her grandmother for about an hour-and-a-half, Mrs. Dominick returned to Opelousas. As she passed LeJeune's Grocery, she noticed an unusually large number of vehicles parked outside the store.")

[citations omitted]" [*State of Louisiana v. Joseph Patrick Guillory*, 2005-853 (La. App. 3 Cir. 2/1/2006 at p. 2; Doc. 16-3, p. 330; SCR 1530]

The Court then noted,

On appeal the reviewing court 'does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.' [citation omitted] Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis advanced by the defendant is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. *Id.*

The defendant does not deny that he was present at the time the victim was murdered. He merely contends that he had no idea that Justin Singleton intended to rob the grocery store and shoot the victim in the process. Therefore, the case at bar presents a straight credibility case. Thus, the only issue before this court is whether the trier of fact's credibility determination was rational... [*Guillory, supra*, at p. 4; Doc.16-3, p. 332; SCR 1532]

Thereafter, the Court of Appeals applied the above recited standards of law to the facts as established by the evidence at trial [*See Guillory, supra*, at pp. 5-15; Doc. 16-3, pp. 333-343; SCR, pp. 1533-1543] –

1. Dr. Cameron Snider, an expert in forensic pathology performed an autopsy of the victim, Mr. Kersey LeJeune. He located two gunshot wounds on the victim's head and neck. He opined that the wounds had features of distant gunshot wounds and were fired in close sequence with one another. [Doc. 16-1, pp. 94-120;  SCR pp. 494-520]

2. Winnie Wong, an expert in the field of forensic chemistry with a sub-speciality in DNA analysis testified that the DNA sample from the money tray in the store was contributed by the victim and the DNA of a minor contributor was "too incomplete for comparison." DNA samples from the investigating officers and the defendant were compared to DNA traces found on the .38 caliber handgun that was seized when petitioner and Singleton were arrested. The

29

DNA sample from the pistol's trigger did not match any of the reference samples and the petitioner was excluded as a possible contributor of the DNA on the trigger. The DNA profile from the right side of the magazine was too incomplete for comparison and the petitioner was excluded as a donor of the DNA profile found on the left side of the grip. She also testified that DNA analysis of the blood stain on petitioner's shoe showed to a reasonable degree of certainty that the blood matched that of the victim. [ Doc. 16-1, pp. 121-151; SCR pp. 521-551]

3. Mark Kurowski, an expert in the field of forensic science with a specialty in trace evidence testified through a stipulation that the shoe print on the mat taken from behind the counter was of the same class, size, and characteristics as petitioner's shoe. [ Doc. 16-1, pp. 152-156; SCR pp. 552-556]

4. Doug Lancon, an expert in forensic science with a specialty in firearms identification testified by stipulation that the unspent casing found in the parking lot, the two spent casings found in the store, and the two projectiles recovered from the victim and the store were fired by the .38 caliber firearm seized at the time of petitioner's arrest. [Doc. 16-1, pp. 157-162; SCR pp. 557-562]

5. Velma Jane LeJeune testified to the victim's practices with regard to cash on hand at the store and stated that he ordinarily kept $60 (twenty 1 bills; four 5 bills, two 10 bills and some change) in the till and kept larger bills in a bank bag. [Doc. 16-1, pp. 164-174; SCR pp. 564-574]

6. Byron St. Andre testified that he could see the store from his kitchen window. At noon on March 4 he observed a yellowish-creamish Caprice Classic turn around in his driveway, cross the railroad tracks and stop at the stop sign for approximately 15 minutes. The vehicle was occupied by two African-American men.  Sometime in the afternoon he saw the vehicle again

headed for Opelousas. He noticed that the car did not have a license plate. He testified that the driver had "a real slick head" but the passenger's head was "bumpy" indicating braids. [Doc. 16-1, pp. 175-189; SCR pp. 575-589]

7. John Keith Pierrotti was a regular customer at LeJeune's Grocery. On March 4, 2003 at approximately 5 p.m. he stopped at LeJeune's and noticed a yellow Caprice Classic in the parking lot.  He noticed a black male leaving the store and getting into the vehicle on the passenger's side. This male was wearing a "do rag" and two tone jacket. Once he got into the car it revved up and took off with tires spinning. It made a U-turn and petitioner noticed that the driver was a black male and that the vehicle did not have a license plate. He then entered the store and discovered the victim shot behind the counter. He returned to his truck to fetch his cell phone so that he could call 911, however, upon exiting the store he flagged down Officer Bellard of the Opelousas Police Department who happened to be passing. Bellard checked on the victim then returned and radioed the station providing a description of the suspect vehicle and its two occupants. [Doc. 16-1, pp. 190-219; SCR, pp. 590-619]

8. Jason Anderson, a Grambling student, was visiting with petitioner and Singleton for Mardi Gras. He testified that he had never known the petitioner to carry a weapon. He awoke on March 4 at about 9-10 a.m. and noted that petitioner and Singleton were both present. About 45 minutes later he went to his grandmother's house and when he returned, the petitioner and Singleton were gone and he did not see them for the rest of the date. He testified that defendant drove a tan Caprice Classic that Singleton would frequently borrow. [Doc. 16-1, pp. 244-259; SCR, pp. 644-659]

9. Mary Agnes Guillory Dominick , a relative to both petitioner and Singleton, observed

31

the pair walking down the side of Hwy 190 heading toward Eunice and carrying a gas can on March 4 between 4:30 - 4:45.  She drove them to their car and left noticing that they were headed for Opelousas. [Doc. 16-1, pp. 260-271; SCR, pp. 660-671]

      10. Mrs. Aimee Bollich (Monceaux), a registered nurse, upon her arrival, found the victim lying in a pool of blood; she pulled him down in order to open an airway. [Doc. 16-1, pp. 274-285; SCR, pp. 674-685]

      11. Willie Malden the Dispatcher with the Church Point Police Department testified via stipulation that at approximately 5:20 p.m. he received a call concerning the situation at LeJeune's Grocery. [Doc. 16-1, pp. 288-291; SCR, pp. 688-691]

      12. Officer Tim Valair of the Church Point Police Department received the dispatch to be on the look out for the yellow Caprice Classic. He located the vehicle and observed that it was occupied by two black males. He followed the pair to a Chevron Station inside the Church Point City limits; while awaiting back up he noticed that the license was improperly displayed. He observed the passenger exit the vehicle and enter the Chevron Station where he remained for a few minutes before returning to the vehicle. When he returned he retrieved the license plate to attach it properly.  When back-up arrived Officer Valair approached the driver's side and noted that the driver was wearing a "rag on his head." The driver was later identified as Justin Singleton, and the passenger was identified as petitioner. [Doc. 16-1, pp. 292-301; SCR, pp. 692-701]

      13. Officer Michael Jared Lafosse was part of the team of Church Point Police Officers who approached petitioner's vehicle at the Chevron Station on March 4. When he approached, petitioner was attempting to attach a license plate to the rear of the vehicle.  The driver,

32

Singleton, was described as having his hair braided and wearing a "do rag." Neither party was armed, however, Lafosse discovered a small caliber handgun in the armrest on the front seat. [Doc. 16-2, pp. 301-302; 315-323; SCR, pp. 701-702; 715-723]

14. Officer Mark Venable of the Church Point Police Department was also present at the time of the arrest. He noticed the petitioner attempting to attach a license plate to the vehicle. He approached petitioner, patted him down, and discovered a bundle of case and a cigarette lighter. This property was placed on the front seat of the vehicle. [Doc. 16-2, pp. 324-333; SCR, pp. 724-733]

15. Officer Craig Ortego testified by stipulation that he seized the money that had been placed on the seat and sealed it in an evidence envelope. When opened in court the envelope contained two 10 dollar bills, four 5 dollar bills and twenty-eight 1 dollar bills. Singleton had an additional $9.46 on his person. [Doc. 16-2, pp. 334-337; SCR, pp. 734-737]

16. Defendant testified that he awoke between 10 - 10:30 a.m. on March 4 and that he was the owner of yellow, tan or beige Caprice Classic.  He claimed that Singleton borrowed the vehicle that morning and was gone for 90 minutes. Upon his return petitioner and Singleton left together. En route to Opelousas they ran out of gas. They walked to a nearby station and as they were walking back to the car, their relative, Agnes stopped and gave them a ride back to the vehicle. They got the car started and drove to Opelousas to visit Singleton's friend. They stayed in Opelousas for about 45 - 60 minutes and returned home so that Singleton could fetch his identification card.  Singleton ordered petitioner to stop as they neared LeJeune's Store and both went into the store. Singleton asked for a cigar and when Mr. LeJeune turned his back to him, Singleton pulled out a pistol and shot him. Petitioner remonstrated with Singleton and crawled

over the counter to check on the victim. An exchange of expletives occurred and Singleton shot the victim a second time. Petitioner did not take any money, and testified that he had no idea about Singleton's plans to rob the store and shoot the proprietor. Petitioner ran from the store and got in his car. Because he was "messed up" he did not think to drive off and waited 2-3 minutes at which time Singleton exited the store and entered the car. Singleton was wearing a dark brown jacket with tan stripes on each arm, blue jeans, and he covered his braided hair with a "do rag." Once in the car Singleton told petitioner to drive to Opelousas. Petitioner later stopped the vehicle so that Singleton could drive. Singleton drove to Church Point, stopped at a Chevron station, grabbed bills from his pocket which he gave to the petitioner and directed him to pay for some gas. Petitioner complied and purchased $10 worth of gas.  Petitioner denied being in the car earlier during the day but noted that Singleton had borrowed it that morning. He claimed that he had no knowledge of Singleton's plans.  He claimed he did not see Singleton rack the gun and had no idea how an unspent cartridge wound up in the parking lot. After his arrest he was questioned by Officers Speyrer and Willis. He told the officer that he had been to LeJeune's on the morning of March 3 when he bought boudin and later shot turtles from the Lucius Guillory Bridge with Singleton. [Doc. 16-1, pp. 340-400; 16-2, pp. 1-35; SCR, pp. 740-835]

      17. Speyrer testified that in the course of conducting an atomic absorption test, petitioner admitted  being at the store on the morning of March 4 and that he kept the .38 caliber Colt pistol in his car for protection. [Doc. 16-2, pp. 37-47; SCR, pp. 837-847]

      18. Willis testified that petitioner admitted  being in the store earlier on the morning of March 4; that he had shot turtles from the bridge on March 3 and that petitioner denied any knowledge of what happened in the store on March 4. [Doc. 16-2, pp. 48-57; SCR, pp. 848-857]

The Court concluded,

In viewing the evidence in the light most favorable to the prosecution, the prosecution proved that the defendant was present at the LeJeune grocery store when the victim was shot and robbed. The prosecution showed that earlier that day Justin Singleton and another black male were in a car across the street from the grocery store. Additionally, the defendant's contention that Justin Singleton shot the victim once and then again after the victim fell, does not mesh with the scientific opinions and findings of Dr. Snider. The state also showed that the defendant may have given conflicting statements to the sheriff's department before asking to have an attorney present.

The trier of fact made a credibility determination and rejected the testimony of the defendant that he had no knowledge of Mr. Singleton's intentions of robbing the grocery store and shooting the victim. As this court may impinge on the fact finder's discretion only to the extent necessary to guarantee fundamental due process of law, we find the evidence is sufficient to support the conviction. [*Guillory, supra*, at p. 15; Doc. 16-3, p. 343, SCR, p. 1543]

The Supreme Court's test for analyzing constitutional challenges to the sufficiency of the evidence was set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  The Supreme Court observed therein that the Due Process Clause of the Fourteenth Amendment guarantees the right to be free from criminal conviction "except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt as to the existence of every element of the crime." *Id.* at 316.  Jackson held that a *habeas* petitioner is entitled to relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.

Louisiana law, namely La. R.S. 15:438, requires that if circumstantial evidence is used to support a conviction, "it must exclude every reasonable hypothesis of innocence."  However, to the extent that R.S. 15:438 imposes a heavier burden on the prosecution than *Jackson*, federal courts need not consider it in cases arising under 28 U.S.C. §2254. *See Schrader v. Whitley*, 904

35

F.2d 282, 284 (5th Cir.1990) ("in challenges to state convictions under 28 U.S.C. § 2254, only *Jackson* need be satisfied, even if state law would impose a more demanding standard of proof").

In this case, the petitioner does not contend that the evidence was insufficient to prove that Justin Singleton committed the armed robbery and murder of Mr Lejeune; rather, he argues that the evidence of his complicity in those crimes was circumstantial, refuted by his testimony, and therefore, insufficient to support his conviction.

As noted above, the Louisiana Third Circuit Court of Appeal determined that the evidence adduced at trial, when viewed in the light most favorable to the prosecution, was sufficient to convict petitioner as a principal to the offenses of armed robbery and murder. The evidence adduced at trial, when viewed in the light most favorable to the prosecution, established that petitioner and Singleton drove to Lejeune's Grocery together on the afternoon of March 4, 2003; that one of them was armed with a .380 Colt pistol; that the weapon was "racked" in the parking lot causing an unfired cartridge to be ejected onto the ground; that both entered the store together; that  Mr. Lejeune was shot twice in the head by one of the men; that petitioner jumped the counter and a spot of the victim's blood wound up on his soe; that cash was taken from the till; that the pair returned to petitioner's car; that the car, driven by petitioner sped away toward Church Point; that at some point the men exchanged positions in the car; that they stopped at a Chevron Station in Church Point; that petitioner entered the store and purchased $10 worth of gas; and that upon his return to the vehicle the pair were arrested by members of the Church Point Police Department; that petitioner was found to be in possession of $68 consisting of two 10 dollar bills, four 5 dollar bills and twenty-eight 1 dollar bills; that the .380 Colt pistol was seized from inside the car and was proven, by forensic testing, to the murder

weapon and the weapon from which the cartridge found in the parking lot was ejected; that petitioner admitted to keeping the .380 Colt pistol in his car for protection.  The only evidence suggesting that petitioner was not guilty of armed robbery and murder was his own self-serving testimony which was obviously rejected as false by the jury.

The Court of Appeals correctly applied the standard set forth in *Jackson*, *supra*. Petitioner has not shown that the Courts' findings of fact and conclusions of law were unreasonable and therefore, his claim must be denied.

### *Recommendation*

Therefore, considering the foregoing,

**IT IS RECOMMENDED** that petitioner's petition for writ of *habeas corpus* filed pursuant to 28 U.S.C. §2254 be **DISMISSED WITH PREJUDICE** because each claim fails on the merits.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy of any objections or response to the District Judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.**

*See, Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.  1996).

       Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties  may file a memorandum setting forth arguments on whether a certificate of appealability should issue.**  See 28 U.S.C. §2253(c)(2).  **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

       In Chambers, Lafayette, Louisiana July 13, 2015.

                                  _____

                                  **PATRICK J. HANNA**
                                  **UNITED STATES MAGISTRATE JUDGE**

COPY SENT:

DATE:   7/13/2015
BY:           EFA
TO:           RTH
               pj